**Kevin SAMPSON and Jane Doe, Individually and as Representatives of the Class of All Other Persons Similarly Situated, Appellants,**

v.

**STATE of Alaska, Appellee.**

No. S–9338.

Supreme Court of Alaska.

Sept. 21, 2001.

---

Robert H. Wagstaff, Law Offices of Robert H. Wagstaff, Anchorage, and Kathryn Tucker, Perkins Coie, LLP, Seattle, WA, for Appellant.

Eric A. Johnson, Assistant Attorney General, Office of Special Prosecutions and Ap-

peals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

James M. Gorski, Hughes, Thorsness, Powell, Huddleston & Bauman, L.L.C., Anchorage, for Amicus Curiae Alaska Catholic Conference.

William Grant Callow, Law Office of William Grant Callow, P.C., Anchorage, for Amicus Curiae Alaska Civil Liberties Union.

Joseph M. Moran, DeLisio, Moran, Geraghty & Zobel, P.C., Anchorage, and James Bopp, Jr., National Legal Center for the Medically Dependent & Disabled, Terre Haute, IN, for Amicus Curiae National Legal Center for the Medically Dependent & Disabled, Inc.

Kevin G. Clarkson, Brena, Bell, & Clarkson, P.C., Anchorage, for Amici Curiae North Star Civil Rights Defense Association, Inc., Focus on the Family, Family Research Council, and Alaskan Doctors Against Physician Assisted Suicide.

James M. Shine, James M. Shine, P.C., Juneau, for Amici Curiae Not Dead Yet and Alaska Not Dead Yet.

Timothy Lynch, Lynch & Blum, P.C., Anchorage, for Amicus Curiae Physicians for Compassionate Care.

Before FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

## OPINION

BRYNER, Justice.

## I.   INTRODUCTION

■ Kevin Sampson and Jane Doe were mentally competent, terminally ill adults who sued for an order declaring their physicians exempt from Alaska's manslaughter statute for the purpose of assisting them to commit suicide.  The superior court entered summary judgment against Sampson and Doe, and they appealed.  We affirm the judgment, concluding that the Alaska Constitution's guarantees of privacy and liberty do not afford terminally ill patients the right to a physician's assistance in committing suicide and that Alaska's manslaughter statute did not violate Sampson and Doe's right to equal protection.

## II.   FACTS AND PROCEEDINGS

Sampson was an accountant who was diagnosed as carrying human immunodeficiency virus (HIV) in 1985.[1]  In 1992 doctors diagnosed Sampson as having acquired immune deficiency syndrome (AIDS) due to an AIDS-defining opportunistic infection.  By 1998 Sampson's doctors had advised him that he was in the terminal phase of AIDS. Sampson asserted that he wanted his physician's assistance to end his life.

Doe was a physician.[2]  She was diagnosed as having breast cancer in 1977 and later retired from her practice of medicine as a result of the disease.  Doe underwent a mastectomy, but the cancer metastasized and was rediscovered in 1989 in her ribs and then later in her skin.  Despite radiation and chemotherapy, the cancer had spread to Doe's bones and liver by 1998.  Doe's doctors informed her that she was in the terminal stages of her cancer.  Doe asserted that she wanted to have the option of physician assistance in ending her life.

Sampson and Doe filed suit, asking the superior court to declare Alaska's manslaughter statute invalid to the extent that it prevents mentally competent, terminally ill individuals from obtaining prescribed medication to self-administer for the purpose of hastening death.  The state answered, and both sides moved for summary judgment. Superior Court Judge Eric T. Sanders denied Sampson and Doe's motion for summary judgment and granted the state's cross-motion.  Sampson and Doe appeal.

## III.   DISCUSSION

### A.   Standard of Review

■ We review appeals from summary judgment de novo.[3]  Because Sampson and

---

1.  Sampson died while this case was pending.

2.  Doe is a pseudonym used to protect the physician's privacy.  Doe also died while this case was pending.

3.  *See Kodiak Island Borough v. Exxon Corp.*, 991 P.2d 757, 759 (Alaska 1999).

Doe do not dispute the material facts, we will affirm the summary judgment if the state is entitled to judgment as a matter of law.[4] The constitutionality of a statute and constitutional interpretation are questions of law to which we apply our independent judgment.[5] "We interpret the constitution and Alaska law according to reason, practicality, and common sense, taking into account the plain meaning and purpose of the law as well as the intent of the drafters."[6]

**B.** *Alaska's Manslaughter Statute Is Constitutional.*

Alaska is among the vast majority of states that criminalize assisted suicide.[7] Alaska Statute 11.41.120(a)(2) provides: "A person commits the crime of manslaughter if the person intentionally aids another person to commit suicide." The statute makes no exception for physicians assisting their patients. Sampson and Doe challenge the statute insofar as it denies them the right to a physician's assistance in committing suicide, arguing that it infringes their constitutional rights to privacy, liberty, and equal protection.

**1.** *Constitutional rights to privacy and liberty*

Sampson and Doe contend that the guarantees of privacy and liberty in article I of the Alaska Constitution [8] protect their right to "control the timing and manner of [their] death[s]."

**a.** *The applicable balancing test*

This court has often emphasized the importance of personal autonomy under our constitution.[9] Yet we have also recognized that the rights to privacy and liberty are neither absolute nor comprehensive—that their limits depend on a balance of interests.[10] The nature of the balance varies with the importance of the rights actually infringed.[11]

When the state encroaches on fundamental aspects of the rights to privacy or liberty, it must demonstrate a compelling governmental interest and the absence of a less restrictive means to advance that interest.[12] But "[w]hen, on the other hand, governmental action interferes with an individual's freedom in an area that is not characterized as fundamental, a less stringent test is ordinarily applied."[13] To justify interference with non-fundamental aspects of privacy and liberty, the state must show a legitimate interest and a close and substantial relationship between its interest and its chosen means of advancing that interest.[14] Sampson and Doe contend that application of the manslaughter statute to physician-assisted suicide fails to with-

---

4. *See id.;* Alaska R. Civ. P. 56(c).

5. *See Hickel v. Cowper,* 874 P.2d 922, 926 (Alaska 1994).

6. *Native Village of Elim v. State,* 990 P.2d 1, 5 (Alaska 1999).

7. *See Washington v. Glucksberg,* 521 U.S. 702, 710–11 & n. 8, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) (stating that forty-four states criminalize assisted suicide).

8. Article I, section 22 of the Alaska Constitution states: "The right of the people to privacy is recognized and shall not be infringed. The legislature shall implement this section."
   Article I, section 1 states:
   This constitution is dedicated to the principles that all persons have a natural right to life, liberty, the pursuit of happiness, and the enjoyment of the rewards of their own industry; that all persons are equal and entitled to equal rights, opportunities, and protection under the law; and that all persons have corresponding obligations to the people and to the State.

9. *See, e.g., Valley Hosp. Ass'n v. Mat–Su Coalition for Choice,* 948 P.2d 963, 968 (Alaska 1997); *Ravin v. State,* 537 P.2d 494, 500, 502–03 (Alaska 1975); *Breese v. Smith,* 501 P.2d 159, 168–69 (Alaska 1972).

10. *See State v. Erickson,* 574 P.2d 1, 21–22 (Alaska 1978) (holding that right to privacy in home not absolute and did not protect ingestion of cocaine); *Breese,* 501 P.2d at 170 (noting fundamental right to control appearance not absolute).

11. *See Breese,* 501 P.2d at 169–70; *see also Valley Hosp.,* 948 P.2d at 968–69.

12. *See Valley Hosp.,* 948 P.2d at 969; *Ravin,* 537 P.2d at 497–98.

13. *Ravin,* 537 P.2d at 497.

14. *See id.* at 497–98, 511.

stand scrutiny under either of these standards.

### b. *Physician-assisted suicide is not a fundamentally protected constitutional right.*

Sampson and Doe initially argue that physician-assisted suicide is a fundamental right guaranteed by the privacy and liberty clauses of the Alaska Constitution. Neither clause explicitly deals with the right to die or to assisted suicide. But we have previously acknowledged this court's responsibility to recognize fundamental rights under the Alaska Constitution that are not within its literal language. In *Baker v. City of Fairbanks* we stated:

> [W]e are under a duty ... to develop additional constitutional rights and privileges under our Alaska Constitution if we find such fundamental rights and privileges to be within the intention and spirit of our local constitutional language and to be necessary for the kind of civilized life and ordered liberty which is at the core of our constitutional heritage.[15]

In keeping with *Baker,* our cases have identified several rights not explicitly mentioned in the Alaska Constitution as fundamental freedoms within the intention and spirit of its language; these rights include the right to reproductive privacy,[16] the right to control personal appearance,[17] the right to privacy within the home,[18] and the right of self-representation in a post-conviction hearing.[19] With these cases in mind, we turn to the right at issue here—the right of physician-assisted suicide.

We begin our analysis by looking to the relevant history of assisted suicide within Alaska's constitutional heritage.[20] Sampson and Doe offer nothing from the Alaska Constitution's history suggesting that either suicide or assisted suicide were topics of concern when the privacy and liberty clauses were drafted and adopted. The approach of the Alaska Statutes toward assisted suicide has been consistent since statehood: Alaska law has prohibited all forms of assisted suicide and has never recognized an exception for physicians assisting their patients.[21]

The criminal code in effect at statehood included a provision prohibiting assisted suicide that closely resembles our current statute.[22] In 1978 the Alaska legislature enacted a comprehensive criminal code to replace then-existing criminal statutes.[23] The Criminal Code Revision Subcommission's report specifically recommended retaining the ban of assisted suicide, stating that the ban furthers two purposes: (1) "to indicate a duty not to knowingly facilitate suicide;" and (2) "to make clear that this activity is not to be viewed as murder unless the defendant uses duress or deception in bringing about the suicidal act." [24] Acting on this recommenda-

15. 471 P.2d 386, 402 (Alaska 1970).

16. *See Valley Hosp.,* 948 P.2d at 966–69.

17. *See Breese,* 501 P.2d at 169.

18. *See Ravin,* 537 P.2d at 502–03.

19. *See McCracken v. State,* 518 P.2d 85, 89, 91 (Alaska 1974) (holding self-representation in a post-conviction hearing to be a fundamental right under the "retained rights" provision of article I, section 21 of the Alaska Constitution).

20. *See, e.g., Breese,* 501 P.2d at 169; *McCracken,* 518 P.2d at 91; *accord Washington v. Glucksberg,* 521 U.S. 702, 710, 117 S.Ct. 2258 (1997) ("We begin ... by examining our Nation's history, legal traditions, and practices.").

21. *See* former AS 11.15.050 (reprinted in Alaska Criminal Code Revision Part I, at 102 (Tent. Draft 1977)). Sampson and Doe have offered no pre-statehood law or history suggesting a unique tolerance for suicide or assisted suicide in Alaska.

22. *See id.* ("A person who purposely and deliberately procures another to commit self-murder or assists another in the commission of self-murder is guilty of manslaughter, and is punishable accordingly.").

This statute and the other old criminal statutes were largely unchanged from the territorial law—itself a derivation of Oregon law enacted by Congress and applied to Alaska in 1899. *See* Alaska Criminal Code Revision Part I, at 6 (Tent. Draft 1977).

23. *See* ch. 166, § 3, SLA 1978.

24. Alaska Criminal Code Revision Part I, at 33 (Tent. Draft 1977). The only other legislative history commenting on the assisted suicide provision states: "the crime of manslaughter also specifically covers the situation when a person

tion, the legislature retained the ban on assisted suicide in its current form.[25]

In 1996 the legislature considered a bill that would have decriminalized physician-assisted suicide by exempting it from Alaska's manslaughter statute.[26] The proposed Act Relating to the Rights of Terminally Ill Persons closely resembled the Oregon Death with Dignity Act passed by ballot initiative in Oregon.[27] The bill failed to pass our legislature, and physician-assisted suicide remains within the scope of the manslaughter statute's assisted suicide provision.[28]

Sampson and Doe nonetheless point to Alaska's tradition of respect for individual freedom; they argue that their strong interest in personal autonomy encompasses physician-assisted suicide and justifies locating that right within the core of our constitution's guarantees of privacy and liberty.

Our cases dealing with personal autonomy do not go as far as Sampson and Doe suggest. In *Valley Hospital Ass'n v. Mat–Su Coalition for Choice*, we recognized that reproductive rights are fundamental and protected by the right to privacy.[29] A quasi-public hospital had instituted a policy that prohibited abortions from being performed at the hospital.[30] We held that the hospital's policy infringed a woman's fundamental right to reproductive autonomy, which included the

right to abortion.[31] In holding that reproductive rights were fundamental, we stated that "[a] woman's control of her body, and the choice whether or when to bear children, involves the kind of decision-making that is 'necessary for ... civilized life and ordered liberty.'"[32] We also acknowledged the important relationship between reproduction and privacy: "[D]ecisions whether to accomplish or prevent conception are among the most private and sensitive."[33]

In *Breese v. Smith,* we held that Alaskans have a fundamental right to control their appearance.[34] We addressed a dispute over a school board's ability to regulate the appearance of school children and require that male students wear short hair.[35] In establishing that control of personal appearance was a fundamental liberty right, we began by discussing the social history of personal appearance: "Hairstyles have been the subject of great variety and individual taste and have traditionally been left to personal decision; they are manifestations of our diverse and numerous individual personalities."[36] We also stated that the right to control personal appearance implicated the important Alaskan values of the "preservation of maximum individual choice, protection of minority sentiments, and appreciation for divergent lifestyles," as well as "notions of a government of limited powers."[37]

intentionally aids another to commit suicide." Commentary on the Alaska Revised Criminal Code, Senate Journal Supp. No. 47, at 13, 1978 Senate Journal 1399.

**25.** *See* ch. 166, § 3, SLA 1978.

**26.** *An Act Relating to the Rights of Terminally Ill Persons,* House Bill (H.B.) 371, 19th Leg., 2d Sess. (Jan. 8, 1996).

**27.** *Compare id. with* Or.Rev.Stat. § 127.800–.995 (1999).

**28.** The bill was initially referred to the House Committee on Health, Education and Social Services, which heard testimony from witnesses on both sides of the issue. *See* 1996 House Journal 2363; *Hearings on H.B. 371 before the House Standing Committee on Health, Education and Social Services,* 19th Leg., 2d Sess. (Feb. 6 & 13, 1996). The bill was then referred to the House State Affairs Committee, where it remained until the end of the session with no further action taken. *See* 1996 House Journal 2827.

**29.** 948 P.2d 963, 966–69 (Alaska 1997).

**30.** *See id.* at 965, 970–71.

**31.** *See id.* at 969, 972.

**32.** *Id.* at 968 (quoting *Baker v. City of Fairbanks,* 471 P.2d 386, 401–02 (Alaska 1970)).

**33.** *Id.* (quoting *Falcon v. Alaska Pub. Offices Comm'n,* 570 P.2d 469, 479 n. 42 (Alaska 1977)).

**34.** 501 P.2d 159, 169 (Alaska 1972).

**35.** *See id.* at 161.

**36.** *Id.* at 169; *cf. Friedman v. District Court,* 611 P.2d 77, 78 (Alaska 1980) (noting history of court dress code in holding that dress code did not violate constitutional liberty interest).

**37.** *Breese,* 501 P.2d at 169; *see also Valley Hosp.,* 948 P.2d at 968; *Calista Corp. v. Mann,* 564 P.2d 53, 61 (Alaska 1977).

In *Ravin v. State*, we reviewed the claim that the consumption of marijuana was a fundamental right under our constitution.[38] We held that it was not, but we did recognize the fundamental right of privacy within the home.[39] We noted the "distinctive nature of the home" in Alaska's statutory and jurisprudential history in finding that the privacy amendment "was intended to give recognition and protection to the home."[40] We also recounted the importance of individual autonomy in Alaskan history and concluded that the right to privacy in the home is directly linked to a notion of individual autonomy.[41] And privacy within the home, we emphasized, is vital: "If there is any area of human activity to which a right of privacy pertains more than any other, it is the home."[42] Based on these considerations, we ultimately concluded that the right of privacy within the home protected personal possession and consumption of small quantities of marijuana in the home.[43]

Finally, in *McCracken v. State*, we discussed the types of rights that are retained by the people under article I, section 21 of the Alaska Constitution.[44] In *McCracken*, a convicted prisoner asserted that he had the right under the constitution to represent himself in post-conviction hearings.[45] We looked to the legal history of the right of self-representation in Alaska and concluded that it was "long established and of . . . fundamental importance" at the time the Alaska Constitution was enacted.[46] We stated that Alaskans have "valu[ed] the autonomy of the individual and [one's] freedom of choice" and recognized the "paramount importance" of the right "to present one's own case."[47]

*Valley Hospital*, *Breese*, *Ravin*, and *McCracken* collectively set the framework for recognizing fundamental rights of personal autonomy implicit in our constitution. These cases establish that the history and tradition of a right in Alaska are important because they help to determine whether the right falls within the intention and spirit of our constitution. Moreover, history and tradition tend to define our society's expectations of what rights are necessary for civilized life and ordered liberty. All of these cases address situations involving personal autonomy to control our appearance or to direct the course of our lives; none even remotely hints at any historical or legal support for the proposition that the general right of personal autonomy incorporates a right to physician-assisted suicide.

Other courts addressing the issue of personal autonomy support this conclusion as well.[48] As the United States Supreme Court stated in rejecting a claim that personal autonomy protects the right to choose physician-assisted suicide: "That many of the rights and liberties protected by the Due Process Clause sound in personal autonomy does not warrant the sweeping conclusion that any and all important, intimate, and personal decisions are so protected."[49]

Sampson and Doe nevertheless insist that Alaska's privacy clause categorically bars any governmental restriction of personal privacy in the absence of a showing of "genuine harm to others." They particularly emphasize *Valley Hospital*'s reliance on the following quo-

---

38. 537 P.2d 494, 497 (Alaska 1975).

39. *See id.* at 502–04.

40. *Id.* at 503–04.

41. *See id.*

42. *Id.* at 503.

43. *See id.* at 504.

44. 518 P.2d 85, 89, 91 (Alaska 1974). Article I, section 21 of the Alaska Constitution states: "The enumeration of rights in this constitution shall not impair or deny others retained by the people." We note that rights retained under this

section of our constitution are analogous to fundamental rights specifically protected by other sections of our constitution.

45. *See id.* at 87.

46. *Id.* at 91.

47. *Id.*

48. *See Washington v. Glucksberg*, 521 U.S. 702, 727, 117 S.Ct. 2258 (1997); *Donaldson v. Van de Kamp*, 2 Cal.App.4th 1614, 4 Cal.Rptr.2d 59, 62–64 (1992).

49. *Glucksberg*, 521 U.S. at 727, 117 S.Ct. 2258.

tation from Professor Tribe's treatise, *American Constitutional Law:*

> Of all decisions a person makes about his or her body, the most profound and intimate relate to two sets of ultimate questions: first, whether, when, and how one's body is to become the vehicle for another human being's creation; second, when and how—this time there is no question of "whether"—one's body is to terminate its organic life.[50]

According to Sampson and Doe, by ratifying Tribe's language, *Valley Hospital* effectively established physician-assisted suicide as a fundamental right protected under the Alaska Constitution's privacy clause.

But this argument overstates the scope of *Valley Hospital*'s holding. That decision quoted Tribe in the context of a discussion involving reproductive rights; the quoted passage itself appears in the introduction to a section of Tribe's treatise entitled "Governmental Control Over the Body: Decisions About Birth and Babies." [51] In context, then, our use of Tribe's language in *Valley Hospital* cannot properly be read to suggest that we recognized a fundamental right to physician-assisted suicide.

Nor can *Valley Hospital* be read to support Sampson and Doe's argument that the government may not abridge any aspect of personal privacy unless it involves conduct posing a threat of harm to another. In *State v. Erickson,* for example, we stated that "[n]o one has an absolute right to do things in the privacy of his own home which will affect *himself or others* adversely." [52] Other Alaska cases, too, have upheld regulation of private conduct where the only harm threatened was to the actor.[53]

Even if we accepted the proposition that the state cannot regulate any aspect of the

right to privacy in the absence of a threat of harm to others, Sampson and Doe would not prevail on their claim that physician-assisted suicide is a fundamentally protected right. The manslaughter statute's assisted suicide prohibition regulates the conduct of the physician who assists in a suicide, not the conduct of the patient who commits the suicide.[54] And a physician who assists in a suicide undeniably causes harm to others.

For these reasons, we reject Sampson and Doe's contention that physician-assisted suicide is a fundamental right within the core meaning of the Alaska Constitution's privacy and liberty clauses.

> c. *The manslaughter statute's ban on physician-assisted suicide bears a close and substantial relationship to a legitimate state interest.*

Sampson and Doe next contend that, even if the privacy and liberty clauses do not incorporate a fundamental right to physician-assisted suicide, the manslaughter statute's ban on physician-assisted suicide nonetheless amounts to an impermissible interference with their general right to privacy and liberty. To the extent that the manslaughter statute's general prohibition of assisted suicide prevents terminally ill patients from seeking a physician's help in ending their lives, we agree that the provision substantially interferes with Sampson and Doe's general privacy and liberty interests, as guaranteed by the Alaska Constitution. As previously stated, when state action limits non-fundamental privacy or liberty interests, the state must identify a legitimate governmental purpose and show that the challenged limitation

---

50. *See Valley Hosp.*, 948 P.2d at 968 (quoting Laurence H. Tribe, *American Constitutional Law* § 15–10, at 1337–38 (2d ed.1988)).

51. Tribe, *supra* note 50, at 1337.

52. 574 P.2d at 1, 21 (Alaska 1978) (quoting *Ravin,* 537 P.2d at 504) (emphasis added).

53. *See Gibson v. State,* 930 P.2d 1300, 1302 (Alaska App.1997) (identifying harm to individual as justification for prohibition on possessing firearms while intoxicated); *Harrison v. State,* 687

P.2d 332, 338 (Alaska App.1984) (concluding that local option law regulating alcohol was justified as health and welfare measure); *cf.* Tribe, *supra* note 50, at 1372–73 ("[T]he intuition that one's safety is wholly one's own business is simply too far out of phase with the reality of our interdependent society to find any plausible expression in our constitutional order.").

54. *See* AS 11.41.120(a)(2).

bears a close and substantial relationship to that purpose.[55]

There can be little doubt that substantial state interests underlie the manslaughter statute's general ban of assisted suicide. Other courts have recognized state interests in preserving human life,[56] protecting vulnerable persons,[57] protecting the integrity of the medical profession,[58] regulating dangerous substances and activities in the state,[59] and preventing suicide.[60]

In this case, the state emphasizes its strong interest in protecting potentially vulnerable Alaskans, including terminally ill persons, from undue influence. Sampson and Doe do not seriously dispute the legitimacy of this interest as a general proposition. Indeed, by arguing that we should recognize a right to physician-assisted suicide that could be exercised only by mentally competent, terminally ill adults who are capable of self-administering lethal drugs prescribed by their physicians, Sampson and Doe tacitly acknowledge both that assisted suicide generally poses a significant risk of harm to potentially vulnerable persons and that a corresponding need exists for state regulation except in the narrow class of cases that they view to be relatively risk-free.

The chief point of dispute, then, is whether, in the absence of a particularized exception for physicians assisting terminally ill patients, the manslaughter statute's assisted-suicide provision bears a close and substantial relationship to the state's legitimate interest in protecting vulnerable persons. Sampson and Doe posit that, without an exception for physicians, the assisted-suicide ban does not bear a close and substantial relationship to the state's interests. The state forcefully refutes this position. It insists that the terminally ill are a class of persons who need protection from family, social, and economic pressures, and who are often particularly vulnerable to such pressures because of chronic pain, depression, and the effects of medication.

In support of its position, the state cites a New York task force report that unanimously rejected a narrowly tailored exemption similar to the one proposed by Sampson and Doe:

> The moral claim to autonomy is weakened by both the overall risks of the practice and the extraordinary nature of the remedy sought. Moreover, if assisted suicide and euthanasia are legalized, the autonomy of some patients would be extended while the autonomy of others would be compromised by the pressures to exercise these new options.[61]

**55.** *See Ravin v. State,* 537 P.2d 494, 497–98 (Alaska 1975).

**56.** *See Washington v. Glucksberg,* 521 U.S. 702, 728, 117 S.Ct. 2258 (1997); *Cruzan v. Director, Missouri Dep't of Health,* 497 U.S. 261, 282, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990); *Donaldson v. Van de Kamp,* 2 Cal.App.4th 1614, 4 Cal. Rptr.2d 59, 62 (1992); *Krischer v. McIver,* 697 So.2d 97, 103 (Fla.1997).

**57.** *Cf. Glucksberg,* 521 U.S. at 731–32, 117 S.Ct. 2258.

**58.** *Cf. Glucksberg,* 521 U.S. at 731, 117 S.Ct. 2258; American Medical Assoc., *Code of Ethics* § 2.211 (1994).

**59.** *See State v. Erickson,* 574 P.2d 1, 18 (Alaska 1978).

**60.** *See* Alaska Criminal Code Revision Part I, at 33 (Tent. Draft 1977). The comments to the Model Penal Code summarize some of a state's interests in preventing assisted suicide:

> Self-destruction is surely not conduct to be encouraged or taken lightly. The fact that

penal sanctions will prove ineffective to deter the suicide itself does not mean that the criminal law is equally powerless to influence the behavior of those who would aid or induce another to take his own life. Moreover, in principle it would seem that the interests in the sanctity of life that are represented by the criminal homicide laws are threatened by one who expresses a willingness to participate in taking the life of another, even though the act may be accomplished with the consent, or at the request of the suicide victim.

Model Penal Code § 210.5(2) cmt. 5 (1980) (revised commentary on the Model Penal Code as adopted in 1962). We note that Alaska does not allow the death penalty as criminal punishment or otherwise sanction death in any context.

**61.** *See* New York Task Force on Life & Law, *When Death Is Sought: Assisted Suicide and Euthanasia in the Medical Context* at 134 (1994). Notably, the task force included members who believed that physician-assisted suicide was both moral and ethical in certain cases and "consistently promoted autonomy as a fundamental principle in choices about medical treatment." *Id.* at 118, 120.

The task force concluded that public policy considerations of assisted suicide must include a recognition that our society is one that, despite legal and social declarations to the contrary, frequently judges others on the basis of physical and mental disabilities, race, ethnicity, social-standing, and other factors unacceptable in life-valuing decision-making:

> [I]t must be recognized that assisted suicide and euthanasia will be practiced through the prism of social inequality and prejudice that characterizes the delivery of services in all segments of society, including health care. Those who will be most vulnerable to abuse, error, or indifference are the poor, minorities, and those who are least educated and least empowered....
>
> ... [T]here [is no] reason to believe that the practices, whatever safeguards are erected, will be unaffected by the broader social and medical context in which they will be operating. This assumption is naive and unsupportable.[62]

In our view, the state's argument is persuasive. We note that there appears to be no consensus within the medical community about the adequacy of protective measures such as those proposed by Sampson and Doe. Indeed, some medical associations, including two amici to this case, have voiced concerns that physician-assisted suicide is "fundamentally incompatible with the physician's role as healer" and, if adopted, might erode the doctor-patient relationship.[63] As an expression of views currently held by a sizable segment of the medical community, these concerns reinforce the state's position: they illustrate that, even in its application to the relationship between physicians and terminally ill patients, Alaska's assisted-suicide provision furthers the state's protective interests by promoting the integrity of the medical profession and fostering healthy physician-patient relationships.

We note, additionally, that the specifics of Sampson and Doe's proposed physician-assisted suicide exemption are problematic in their own right. A physician-assisted suicide exemption that narrowly restricts the right to mentally competent, terminally ill patients raises many unexamined and potentially troubling issues. For example, Sampson and Doe would have us draw a constitutional line between terminally ill patients who can self-administer lethal drugs and those who cannot. Yet this would arguably amount to discrimination based upon physical disability.

Furthermore, by proposing to restrict physician-assisted suicide to mentally competent adults, Sampson and Doe would hinge the exercise of that right on a vague, unverifiable, and subjective standard. While mental competency is certainly well accepted as a measure for determining when physicians may render life-prolonging medical treatment,[64] it is potentially far more controversial as a measure for determining when a physician is entitled to terminate a patient's life. This is so not only because the prescription of life-ending medication is a unique and absolute form of medical "treatment," but also because the mental competency of terminally ill patients is uniquely difficult to determine.[65]

Sampson and Doe's proposal to extend physician-assisted suicide only to patients who are near death raises similar problems. To define an eligible class of terminally ill persons would be a daunting enterprise—especially for a court of law. And even if a general medical consensus allowed us to resolve the difficult question of how near death

---

62. *Id.* at 125.

63. American Medical Assoc., *Code of Medical Ethics* § 2.211 (1994).

64. *See Cruzan v. Director Missouri Dep't of Health*, 497 U.S. 261, 278, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990).

65. For example, recent studies show a high correlation between depression and the desire of terminally ill patients to end life using physician-assisted suicide. *See* William Breitbart et al., *Depression, Hopelessness, and Desire for Hastened Death in Terminally Ill Patients with Cancer*, 284 J. Am. Med. Assoc. 2907 (Dec. 13, 2000).

Moreover, we note that in the related area of living wills and do-not-resuscitate orders, Alaska law recognizes that an individual's authority to make important decisions does not terminate with the onset of incompetency; it is a durable power, and, as such, can be assigned to others who would be capable of competent action in the event of the individual's incompetency. *See* AS 18.12.010–.100.

a terminally ill patient must be before becoming eligible to request assistance in committing suicide, this resolution would not be particularly helpful, since "physicians' predictions of expected remaining life are generally inaccurate." [66]

In highlighting these difficulties, we do not mean to suggest that they are necessarily insurmountable. Nor do we mean to disparage Sampson and Doe's proposed exemption or to suggest that their arguments lack merit. To the contrary, we recognize that Sampson and Doe have raised close and difficult issues. But these issues flow quickly away from questions of the law and lapse seamlessly into questions of morality, medical ethics, and contemporary social norms. Because the controversy surrounding physician-assisted suicide is so firmly rooted in questions of social policy, rather than constitutional tradition, it is a quintessentially legislative matter.

■ Accordingly, we hold that the right to physician-assisted suicide is not implicit in text, context, or history of the Alaska Constitution's liberty and privacy clauses. While these guarantees encompass a broad range of autonomy, they do not require an exemption to Alaska's manslaughter statute that would provide for physician-assisted suicide. As another court said in reaching the same conclusion: "By broadly construing the privacy amendment to include the right to assisted suicide, we would run the risk of arrogating to ourselves those powers to make social policy that as a constitutional matter belong only to the legislature." [67]

### 2. Equal protection

■ Sampson and Doe also contend that the manslaughter statute's assisted-suicide ban abridges their rights to equal protection.[68] We apply a sliding-scale test in equal protection challenges.[69] The test places a varying burden on the state depending on the importance of the individual right and involves a three-step analysis: first, we identify the nature of the interest affected; next, we assess the importance of the purposes served by the statute; and, last, we analyze the fit between the state interests and means chosen to accomplish those interests.[70]

Our earlier discussion of the Alaska Constitution's privacy and liberty clauses controls the first two prongs of this equal protection analysis. As to the first prong—the nature of the interest affected by the assisted suicide ban—we have already concluded that, although terminally ill patients have no fundamental right to physician-assisted suicide, the assisted-suicide ban nonetheless implicates important privacy and autonomy interests. Thus, the first prong of the sliding-scale test calls for relatively close scrutiny of the ban. As to the second prong—the importance of the government's interest—we have recognized that the state's interest in prohibiting assisted suicide is also important. Accordingly, the third prong of the sliding-scale test—the closeness of the challenged statute's means-to-end fit—will be determinative.

Sampson and Doe argue that, insofar as it prevents physicians from assisting mentally competent, terminally ill patients who wish to end their lives, the assisted-suicide ban is too loosely connected to any legitimate state interest to survive scrutiny under the third prong's test requiring a close and substantial means-to-end fit. They insist that the ban creates arbitrary distinctions, reasoning that it is both over-inclusive and under-inclusive as applied to terminally ill patients because it allows physicians to hasten the deaths of some patients by passive measures—such as withdrawal of life support or terminal sedation—but forbids them from helping other

---

66. Daniel Callahan & Margot White, *The Legalization of Physician–Assisted Suicide: Creating a Regulatory Potemkin Village*, 30 U. Rich. L.Rev. 1, 46 (1996).

67. *Krischer v. McIver*, 697 So.2d 97, 104 (Fla. 1997).

68. Alaska Const. art. I, § 1.

69. *See State v. Erickson*, 574 P.2d 1, 11–12 (Alaska 1978).

70. *See Alaska Pacific Assur. Co. v. Brown*, 687 P.2d 264, 269–70 (Alaska 1984); *State v. Ostrosky*, 667 P.2d 1184, 1192–93 (Alaska 1983); *Erickson*, 574 P.2d at 12.

patients who prefer physician-assisted suicide as a method for hastening death.

The state responds that Sampson and Doe's argument overlooks an important distinction between a physician's active participation in a patient's suicide and a physician's willingness to honor a patient's request to cease or withdraw treatment. We agree that these two types of conduct are significantly different. Their difference reflects the long-recognized distinction between action and forbearance.

In the absence of a clearly established duty to act, our legal system has traditionally imposed liability only for affirmative actions, not for omissions or failures to act. For purposes of establishing criminal liability, Alaska's criminal code adopts this distinction in AS 11.81.600(a) and AS 11.81.900(b)(41). The former provision states that "[t]he minimal requirement for criminal liability is the performance by a person of conduct that includes a voluntary act or the omission to perform an act[.]"[71] The latter limits the definition of "omission" to "a failure to perform an act *for which a duty of performance is imposed by law.*"[72]

In the case of a physician who honors a dying patient's request to withdraw life-sustaining medical treatment, the patient's underlying disease or pathology runs its course and causes death; the death is hastened by the physician's failure to continue treatment. Assuming for the moment that a terminally ill patient's decision to cease further treatment can fairly be likened to suicide, because physicians ordinarily have no duty—indeed, no right—to treat patients who voluntarily reject medical treatment, the physician's omission of further treatment does not create liability for assisting a suicide.[73]

In sharp contrast to this situation, when a physician assists a terminally ill patient by prescribing medication to hasten the patient's death, the death is caused by the patient and is abetted by the physician's affirmative actions. The physician thus becomes liable because the physician actively participates in the patient's suicide.[74]

These admittedly similar situations lead to drastically different outcomes for the physician. But the difference in outcome does not result from an arbitrary application of rules restricting the rights of different classes of terminally ill patients; instead, it is determined by a conventional application of the settled and uniformly accepted legal principle: liability may ordinarily be predicated only on a voluntary action or on a failure to act in the face of a clearly established duty.

Sampson and Doe are therefore mistaken in suggesting that these different outcomes are anomalous or that they evidence an arbitrary scheme of regulation. While the law's traditional distinction between action and forbearance is neither perfect nor easily applied in all cases,[75] it has nonetheless shown itself to be sensible and dependable in the vast majority of situations. Accordingly, we hold that the assisted-suicide statute's reliance on this distinction does not result in the imposition of over-inclusive or under-inclusive restrictions on terminally ill patients who seek to hasten death.

■ Our earlier discussion of the Alaska Constitution's privacy and liberty clauses establishes that the manslaughter statute's as-

---

71. AS 11.81.600(a).

72. AS 11.81.900(b)(41) (emphasis added).

73. *Cf. Vacco v. Quill,* 521 U.S. 793, 801, 117 S.Ct. 2293, 138 L.Ed.2d 834 (1997).

74. The physician's liability in this situation might further be justified on the basis of the physician's intent, since a physician who assists in an act of suicide " 'must, necessarily and indubitably, intend primarily that the patient be made dead.' " *Id.* at 802, 117 S.Ct. 2293 (quoting Testimony of Dr. Leon Kass, *Assisted Suicide in the United States,* Hearing before the Subcommittee on the Constitution of the House Committee on the Judiciary, 104th Cong., 2d Sess., 368 (1996)).

75. One potentially difficult situation might be the practice of terminal sedation. Although both parties discuss terminal sedation in passing, neither offers a clear, generally accepted definition of the procedure nor establishes the extent to which the procedure has been accepted in other jurisdictions as falling outside the definition of physician-assisted suicide. Because the facts of the case do not require us to consider the practice, we express no opinion as to whether, or to what extent, it would fall within the scope of Alaska's assisted-suicide ban.

sisted-suicide ban bears a close and substantial relationship to the state's legitimate interests in all other significant respects. It follows, then, that the ban satisfies the third prong of this court's equal protection test. Accordingly, we conclude that the manslaughter statute's general prohibition of assisted suicide did not, on its face, violate Sampson and Doe's rights to equal protection.

## IV. CONCLUSION

The superior court's decision is AFFIRMED.