**Sharon RANNEY, Appellant,**

v.

**WHITEWATER ENGINEERING** and **Alaska Insurance Guaranty Association for Fremont Industrial (insolvent insurer), Appellees.**

**No. S–11442.**

Supreme Court of Alaska.

Oct. 14, 2005.

**216**

William J. Soule, Law Office of William J. Soule, Anchorage, for Appellant.

Richard L. Wagg, Russell, Tesche, Wagg, Cooper & Gabbert, Anchorage, for Appellees.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

*OPINION*

BRYNER, Chief Justice.

## I. INTRODUCTION

The Alaska Workers' Compensation Act provides that when an employee suffers a work-related death, the employee's surviving widow or widower is eligible for death benefits. When Sharon Ranney sought death benefits after the work-related death of her long-term partner, Gary Stone, the Alaska Workers' Compensation Board ruled that she was not eligible for benefits because she and Stone had never been married. Ranney challenges this ruling, arguing that the board misinterpreted the workers' compensation act and violated her rights to privacy and equal protection under the Alaska Constitution. We affirm the board's decision, holding that the decision correctly interpreted the act and did not deprive Ranney of her constitutional rights, since denying spousal death benefits to Ranney did not substantially burden her freedom to have an unmarried intimate relationship with Stone and was fairly and substantially related to the act's goal of providing quick, efficient, fair, and predicta-

ble benefits to families of deceased workers at a reasonable cost to employers.

## II. FACTS AND PROCEEDINGS

Sharon Ranney and Gary Stone became romantically involved in the spring of 1995 and moved in together that fall. Although Stone and Ranney were never legally married, they lived together as a couple until Gary Stone's death in April 1999.

While together they shared a joint checking account. They were jointly listed in the Cordova telephone book. And they purchased various kinds of machinery together—a small sawmill, a crane, and a truck. Stone also purchased a life-insurance policy and named Ranney the primary beneficiary. Although Ranney worked off and on throughout their relationship, she depended on Stone's income to maintain her standard of living. Ranney submitted many affidavits from friends attesting to the couple's intent to get married. And Ranney testified that Stone bought her a wedding ring in 1997 and that he formally proposed to her in March of 1999.

In April 1999 Stone was killed in a work-related accident while employed by Whitewater Engineering. Ranney then filed a claim for death benefits as Stone's "unmarried spouse." Whitewater and its insurer, Fremont Compensation/Cambridge Integrated Services Group, controverted Ranney's claim on the ground that she was never Stone's wife and that she was therefore not entitled to benefits under the act.

In addressing Ranney's claim, the Alaska Workers' Compensation Board noted that AS 23.30.215 provides for the payment of death benefits to the "widow or widower or a child or children of the deceased." Because the act defines "widow" to include "only the decedent's wife living with or dependent for support upon the decedent at the time of death, or living apart for justifiable cause or by reason of the decedent's desertion at such a time,"[1] the board reasoned that Ranney would qualify as "the decedent's wife" only if she had actually been married to Stone. Since Ranney had never married Stone, the

1. AS 23.30.395(33).

board concluded that she was ineligible for benefits as his "wife."

After appealing to the superior court, which affirmed the board's decision, Ranney filed this appeal.

## III. DISCUSSION

On appeal, Ranney argues that the unmarried partners of deceased employees are eligible to receive death benefits under the workers' compensation act. Moreover, if the act does not cover unmarried but committed relationships like hers and Stone's, Ranney asserts, it violates her rights to privacy and equal protection under the Alaska Constitution.

### A. Standard of Review

■ In an appeal from a decision entered by the superior court as an intermediate court of appeal in a workers' compensation case, "we independently review and directly scrutinize the merits of the board's decision."[2] Determining the proper meaning of the act in this case requires us to interpret the words "widow" and "married"; we review an agency's interpretation of non-technical statutory terms such as these under the substitution of judgment standard.[3] Whether the act violates the Alaska Constitution presents a legal question and does not involve agency expertise. We use our independent judgment to review constitutional questions.[4]

### B. The Act's Express Language

■ Ranney argues that, as Stone's "[u]nmarried, [d]ependent [w]idow," she is entitled to death benefits under the Alaska Workers' Compensation Act. Whitewater responds that because Ranney was never married to Stone, she fails to qualify as his "widow," and so cannot properly claim benefits under the act.

■ When interpreting a statute, "we consider its language, its purpose, and its legislative history, in an attempt to 'give effect to the legislature's intent.' "[5] Although "[w]e have rejected a mechanical application of the plain meaning rule," we have placed a heavy burden on parties who urge us to adopt an interpretation that appears contrary to a statute's plain language.[6]

The workers' compensation act specifies that where a work-related injury causes an employee's death, death benefits are payable to "a widow or widower or a child or children of the deceased."[7] If there is no widow or widower and there are no children, then benefits must be paid to specified members of the extended family.[8]

The act defines "widow" as "only the decedent's wife living with or dependent for support upon the decedent at the time of death, or living apart for justifiable cause or by reason of the decedent's desertion at such a time."[9] The act does not define "wife," but does provide that " 'married' includes a person who is divorced but is required by the decree of divorce to contribute to the support of the former spouse."[10]

Ranney contends that the act's definition of "wife" could plausibly be read to include unmarried cohabitants, so that they would fall within the definition of "widow."

We disagree. The Alaska legislature has directed that

2. *Alyeska Pipeline Serv. Co. v. DeShong,* 77 P.3d 1227, 1231 (Alaska 2003).

3. *Northern Alaska Envtl. Ctr. v. State, Dep't of Natural Res.,* 2 P.3d 629, 633 (Alaska 2000) (noting that we review an "agency's interpretation of . . . non-technical statutory terms under the substitution of judgment standard").

4. *Holding v. Municipality of Anchorage,* 63 P.3d 248, 250 (Alaska 2003).

5. *DeShong,* 77 P.3d at 1234 (quoting *Muller v. BP Exploration (Alaska) Inc.,* 923 P.2d 783, 787 (Alaska 1996)).

6. *Muller v. BP Exploration (Alaska) Inc.,* 923 P.2d 783, 787 (Alaska 1996).

7. AS 23.30.215(a)(2).

8. AS 23.30.215(a)(4).

9. AS 23.30.395(33).

10. AS 23.30.395(19).

[w]ords and phrases shall be construed ... according to their common and approved usage. Technical words and phrases and those which have acquired a peculiar and appropriate meaning, whether by legislative definition or otherwise, shall be construed according to the peculiar and appropriate meaning.[11]

Because "wife" has not been defined statutorily and has no technical meaning in the present context, we look to common usage, where the word ordinarily refers to a married woman.[12] "Marriage" has been defined by statute. The Alaska Marriage Code provides:

(a) Marriage is a civil contract entered into by one man and one woman that requires both a license and solemnization.

. . . .

(b) A person may not be joined in marriage in this state until a license has been obtained for that purpose as provided in this chapter. A marriage performed in this state is not valid without solemnization as provided in this chapter.[13]

We have previously held that this definition of marriage does not recognize common law marriage.[14] Thus, neither common usage nor legislative definition suggests that people in Ranney's position—unmarried cohabitants—should be considered "wives" or "husbands" under the workers' compensation act.

Moreover, the detailed benefits scheme set out in the workers' compensation act suggests that the legislature did not intend to include unmarried cohabitants as beneficiaries. Alaska Statute 23.30.215 provides that if there is a widow or widower and/or children, they are entitled to benefits.[15] If there is no widow or widower and no children, death benefits may go to the employee's parents, grandchildren, brothers, and sisters if they were "dependent upon the deceased at the time of injury." [16]

█ Where a statute expressly enumerates the things or persons to which it applies, we often invoke the principle of statutory construction *expressio unius est exclusio alterius*. This principle "establishes the inference that, where certain things are designated in a statute, 'all omissions should be understood as exclusions.' "[17] We have indicated that "[t]he case for application of *expressio unius est*

---

11. AS 01.10.040(a). *See also Tesoro Alaska Petroleum Co. v. Kenai Pipe Line Co.*, 746 P.2d 896, 905 (Alaska 1983) (citing AS 01.10.040).

12. *See Serradell v. Hartford Accident & Indem. Co.*, 843 P.2d 639, 641 (Alaska 1992) (relying on a lay definition of spouse). *See also Hedlund v. Monumental Gen. Ins. Co.*, 404 N.W.2d 371, 373–74 (Minn.App.1987) (noting that " 'spouse' is commonly known to mean husband or wife"), *quoted in Serradell*, 843 P.2d at 641 n. 6. By the same token, "wife" is commonly known to mean "spouse," or a "married woman."

13. AS 25.05.011.

14. *Harrelson v. Harrelson*, 932 P.2d 247, 250 (Alaska 1997).

15. AS 23.30.215 provides in relevant part:
(a) If the injury causes death, the compensation is known as a death benefit and is payable in the following amounts to or for the benefit of the following persons:
. . . .
(2) if there is a widow or widower or a child or children of the deceased, the following percentages of the spendable weekly wages of the deceased:
(A) 80 percent for the widow or widower with no children;
(B) 50 percent for the widow or widower with one child and 40 percent for the child;
(C) 30 percent for the widow or widower with two or more children and 70 percent divided equally among the children;
(D) 100 percent for an only child when there is no widow or widower;
(E) 100 percent, divided equally, if there are two or more children and no widow or widower;
. . . .
(4) if there is no widow or widower or child or children, then for the support of father, mother, grandchildren, brothers and sisters, if dependent upon the deceased at the time of injury, 42 percent of the spendable weekly wage of the deceased to such beneficiaries, share and share alike, not to exceed $20,000 in the aggregate;
(5) $5,000 to a surviving widow or widower, or equally divided among surviving children of the deceased if there is no widow or widower.

16. AS 23.30.215(a)(4).

17. *Croft v. Pan Alaska Trucking, Inc.*, 820 P.2d 1064, 1066 (Alaska 1991) (citing *Puller v. Municipality of Anchorage*, 574 P.2d 1285, 1287 (Alaska 1978)).

*exclusio alterius* is particularly compelling, where ... the scheme is purely statutory and without a basis in the common law."[18] In the context of the workers' compensation act, which creates a detailed and complicated scheme for requiring employers to provide support to some surviving members of the employee's family, it is appropriate to apply this canon of interpretation. Because the act includes a detailed list of beneficiaries, the failure to include unmarried cohabitants suggests their exclusion.

In addition, as Whitewater points out, the act includes in its definition of "child," a "child in relation to whom the deceased employee stood in loco parentis for at least one year before the time of injury."[19] And it defines "married" to include "a person who is divorced but is required by the decree of divorce to contribute to the support of the former spouse."[20] The legislature's expansion of these definitions shows that where the legislature intended to expand the meanings of commonly understood words, it did so expressly.

Ranney nonetheless contends that "[t]he concept of 'family' is changing," so that she should be included within the definition of family. She notes that state law in many instances includes unmarried persons within its definition of spouse. She cites Alaska's regulations for adult public assistance, which include within the definition of spouse "unmarried persons who live together and hold themselves out to the community as husband and wife."[21] And she points to similar language in Alaska's childcare assistance program and its disaster relief regulations.[22] She argues that these programs are "intended to prevent people from going hungry or homeless." Because "[w]orkers' compensation death benefits serve a very similar

purpose," she contends, a similarly broad definition of family should be read into the workers' compensation act.

But as Whitewater correctly observes in response, under the regulations cited by Ranney the non-traditional family members qualify precisely "because the regulations expressly allow them to do so." At most, these regulations illustrate that agencies are capable of expanding the meanings of common terms when they intend to do so. It may be true that the act's purpose is analogous to the purposes of the various public assistance programs cited by Ranney. But where those programs include non-traditional family members, they do so expressly. Here if the legislature had intended to include unmarried cohabitants in its definition of "widow," it similarly could have done so expressly. Accordingly, it appears that the legislature's intent, as manifested in the statutory language, was to limit beneficiaries to those expressly enumerated in the statute. As Stone's unmarried cohabiting partner, Ranney is not eligible for death benefits under the act's language.

Despite the express language of the statute, Ranney contends that she should be deemed eligible for benefits under our ruling in *Burgess Construction Co. v. Lindley.*[23]

In *Lindley*, the unmarried partner of a construction worker sought workers' compensation benefits when her partner was killed on the job.[24] Jeanne Lindley and the deceased worker, Ronald Lindley, were originally married but had gotten divorced and then later resumed living together.[25] Their divorce decree required Ronald to contribute to Jeanne's support.[26] The construction company argued that because the Lindleys were divorced, Jeanne was not a "surviving

18. *Croft*, 820 P.2d at 1066.

19. AS 23.30.395(6).

20. AS 23.30.395(19).

21. 7 Alaska Administrative Code (AAC) 40.240(b)(2).

22. 4 AAC 65.901(a)(18) (defining "family" for the Child Care Assistance Program); 6 AAC

94.900(12) (defining "family" for Disaster Assistance Programs).

23. 504 P.2d 1023 (Alaska 1972).

24. *Id.* at 1023–24.

25. *Id.* at 1023.

26. *Id.*

wife" entitled to death benefits under the act.[27]

To determine whether Jeanne Lindley was a "surviving wife" we examined the act's language. We observed that it defined "married" to include "a person who is divorced but is required by the decree of divorce to contribute to the support of his former wife."[28] And we noted that "widow" included "the decedent's wife living with or dependent for support upon him at the time of his death."[29] These definitions led us to conclude that

> the decedent, though divorced, was "married" for the purpose of the Workmen's Compensation Act, for the divorce decree required him to contribute to appellee's support. It follows that under the Act appellee would be regarded as his "surviving wife."[30]

We then determined that because she was his wife for purposes of the statute, and because she was living with him and was dependent upon him for her support, Jeanne Lindley qualified as Ronald Lindley's widow.[31] We therefore held that Jeanne Lindley was entitled to benefits.[32]

Ranney argues that *Lindley* stands for the proposition that an unmarried dependent live-in partner is a spouse for purposes of the act; to hold otherwise, Ranney suggests, would frustrate the "liberal humanitarian purposes" of the act.

But Ranney's reliance on *Lindley* is misplaced. To be sure, we described our holding in *Lindley* as required by the "liberal humanitarian purposes of the Act."[33] But *Lindley* hardly supports Ranney's further contention that "the goal of the [Workers' Compensation Act] is to compensate dependent people, not to compensate dependent people who went through a formal ceremony." *Lindley* did not hold that Jeanne Lindley's dependency alone sufficed to render her eligible for benefits. Instead, it relied primarily on the statutory definitions. Under those definitions, Jeanne qualified as being "married" to Ronald Lindley when he died. Consequently, she qualified as his "wife." The definition of widow includes wives who were living with the decedent or who were dependent upon him. Jeanne was both. She therefore qualified as his widow. As his widow, she qualified for benefits. In other words, it was Jeanne's formal, legal relation with Ronald, coupled with her dependency upon him, that qualified her for benefits.

By contrast, Ranney was not, and had never been, married to Stone when he died. And Stone was not legally obligated to support her. Under *Lindley*, then, Ranney does not qualify for benefits.

■ Ranney further argues that the purpose of the act is to compensate dependents for a worker's death. She insists that in light of this purpose, the distinctions created by the statute between married and unmarried "wives" should be ignored. Yet compensating dependents is not the act's singular purpose.[34] The act's broader purpose is to provide a system of compensation that is "quick, efficient, fair and predictable"—and is not unreasonably expensive for employers.[35]

As Whitewater points out, allowing unmarried partners to receive benefits would require the board to distinguish between relationships that were sufficiently serious to merit the award of benefits and those that were not. Whitewater also notes that requiring such a fact-intensive inquiry could

27. *Id.*

28. *Id.* at 1024.

29. *Id.*

30. *Id.*

31. *Id.*

32. *Id.* at 1025.

33. *Id.*

34. Indeed, dependency alone is not enough under the act to render someone eligible for benefits. For example, cousins and friends are never eligible for benefits. The dependent must be a grandchild, a parent, or a sibling. And even those dependents are only eligible if there is neither a surviving spouse nor any children. AS 23.30.215(a)(4).

35. *E.g., Meek v. Unocal Corp.,* 914 P.2d 1276, 1281 (Alaska 1996).

substantially delay the award of benefits and undermine the quick and predictable award of benefits.

The legislature could have adopted a system that required that each relationship be scrutinized on an individual basis to determine whether death benefits should be granted. But it did not. Instead, it engaged in the traditional legislative practice of line drawing. The legislature apparently determined that the potentially increased precision of requiring an ad hoc decision in all cases would be so administratively costly that the system would better be served by using a more formal rule—in this case requiring marriage—for determining which relationships require the payment of benefits.[36] By adopting marriage as the primary criterion for determining when an intimate partner qualifies for benefits, the legislature has determined that legal marriage is an adequate proxy for the more particularized inquiry concerning whether a relationship is serious enough or the partner is sufficiently dependent to justify awarding benefits.

As with all line drawing, particularly where social welfare legislation is involved, the precise point where the line is drawn may seem arbitrary, and there may be "close cases at the margins."[37] But this does not mean that line drawing is impermissible. This kind of line drawing—which involves balancing the benefits of greater precision against its costs and determining how the workers' compensation system can best provide support for workers and their families—is within the legislature's competence. We decline Ranney's invitation to substitute our judgment for the legislature's.

## C. Right to Privacy

■ Ranney alternatively argues that the board's determination that she was ineligible for benefits because she was never married to Stone violates her constitutional right to privacy. Ranney posits that she has a fundamental right "to live with Mr. Stone in a marriage-like relationship without the formality of a civil or religious marriage ceremony." And she argues that "the Board's interpretation of [AS 23.30.215] infringes upon Ms. Ranney's right to privacy because she cannot exercise that right in respect to her intimate relationships without losing her right as a dependent to death benefits under [the statute]."

Article I, section 22 of the Alaska Constitution provides that, "[t]he right of the people to privacy is recognized and shall not be infringed." The right of privacy protects "fundamental rights of personal autonomy,"[38] including a person's right to control

---

**36.** In *Trombley v. Starr–Wood Cardiac Group, PC,* 3 P.3d 916, 923 (Alaska 2000), we noted "the difficulty of assessing the emotional, sexual and financial relationship of cohabiting parties to determine whether their arrangement was the equivalent of a marriage . . . ." (quoting *Elden v. Sheldon,* 46 Cal.3d 267, 250 Cal.Rptr. 254, 758 P.2d 582, 590 (1988)).

**37.** *State, Div. of Elections v. Metcalfe,* 110 P.3d 976, 981 (Alaska 2005). *See also Califano v. Boles,* 443 U.S. 282, 284, 99 S.Ct. 2767, 61 L.Ed.2d 541 (1979) (noting that with social security legislation, "[t]he process of categorization presents the difficulties inherent in any linedrawing exercise where the draftsman confronts a universe of potential beneficiaries with different histories and distinct needs. He strives for a level of generality that is administratively practicable with full appreciation that the included class has members whose 'needs' upon a statutorily defined occurrence may not be as marked as those of isolated individuals outside the classification. 'General rules are essential if a fund of this magnitude is to be administered with a mo-

dicum of efficiency, even though such rules inevitably produce seemingly arbitrary consequences in some individual cases.' A process of case-by-case adjudication that would provide a 'perfect fit' in theory would increase administrative expenses to a degree that benefit levels would probably be reduced, precluding a perfect fit in fact.") (internal citation omitted). *See also Colgrove v. Battin,* 413 U.S. 149, 183, 93 S.Ct. 2448, 37 L.Ed.2d 522 (1973) (Marshall, J., dissenting) ("Normally, in our system we leave the inevitable process of arbitrary line drawing to the Legislative Branch, which is far better equipped to make ad hoc compromises. In the past, we have therefore given great deference to legislative decisions in cases where the line must be drawn somewhere and cannot be precisely delineated by reference to principle. This Court has involved itself in the sticky business of separating cases along a continuum only when the Constitution clearly compels it to do so and when the legislature has plainly defaulted.").

**38.** *Sampson v. State,* 31 P.3d 88, 94 (Alaska 2001).

his appearance,[39] a patient's "privacy interest in protecting sensitive personal information from public disclosure," [40] and a woman's reproductive rights.[41] Ranney argues that the right to privacy similarly protects her right to have an unmarried intimate relationship with Stone.

When a party argues that a statutory provision violates the party's right to privacy, we ordinarily balance the importance of the individual right allegedly infringed against the interests of the state.[42] Where a fundamental right is infringed, we require the state to articulate a compelling interest and to demonstrate the absence of a less restrictive alternative.[43] In contrast, where the state "interferes with an individual's freedom in an area that is not characterized as fundamental," we require the state to "show a legitimate interest and a close and substantial relationship between its interest and its chosen means of advancing that interest." [44]

Here, we assume for purposes of our decision that Ranney has a fundamental right to have an unmarried intimate relationship with Stone. But even so, her constitutional claim falls short because the workers' compensation act at most imposes only a minimal burden on the relational freedom asserted by Ranney.

Ranney's privacy argument seems to assume that conferring a benefit on persons who marry necessarily burdens liberty interests of persons who freely choose not to. But the state's decision to provide benefits to people who choose to exercise a constitutional right does not invariably require it to provide equal benefits to those who decline to exercise the right. For example, the state provides free public schooling at state expense.[45] But providing these benefits to parents does not require the state to provide matching funds to people who choose not to have children. Nor does the state's failure to do so impose any significant burden on their important privacy interest in choosing not to have children. Similarly, in the present case, the state's decision to provide benefits to married people unquestionably benefits couples who choose to marry; but giving this admittedly one-sided benefit to persons who marry does not in itself equate to imposing a significant burden on those who freely choose not to. Yet apart from relying on the one-sided nature of the benefit, Ranney has failed to explain how her relational rights have been burdened. Nor do we perceive any significant burden. To be sure, our substantive due process clause requires that all laws bear a reasonable relation to a legitimate state purpose.[46] But as we explain below in discussing Ranney's equal protection complaint, the challenged legislation easily satisfies that standard. Thus, given Ranney's failure to identify any significant burden on the rights of unmarried couples to pursue committed relationships while choosing not to marry, we find no violation of her right to privacy.

## D. Equal Protection

Ranney also argues that the workers' compensation act infringes her right to equal protection under the law. She argues that she is similarly situated to legally married wives: "Ms. Ranney was dependent upon Mr. Stone at the time of his death just like legally married wives are dependent upon their husbands." And she contends that because, unlike legally married wives, "dependents in her situation" are not eligible for benefits, AS 23.30.215·violates the equal protection clause.

We apply a sliding scale to equal protection analysis.

**39.** *Breese v. Smith,* 501 P.2d 159, 169 (Alaska 1972).

**40.** *Falcon v. Alaska Pub. Offices Comm'n,* 570 P.2d 469, 480 (Alaska 1977).

**41.** *Valley Hosp. Ass'n, Inc. v. Mat–Su Coalition for Choice,* 948 P.2d 963, 969 (Alaska 1997).

**42.** *Sampson,* 31 P.3d at 91.

**43.** *Id.*

**44.** *Id.*

**45.** AS 14.03.080.

**46.** *Cabana v. Kenai Peninsula Borough,* 50 P.3d 798, 805 (Alaska 2002).

To implement Alaska's ... equal protection standard, we have adopted a three-step, sliding-scale test that places a progressively greater or lesser burden on the state, depending on the importance of the individual right affected by the disputed classification and the nature of the governmental interests at stake: first, we determine the weight of the individual interest impaired by the classification; second, we examine the importance of the purposes underlying the government's action; and third, we evaluate the means employed to further those goals to determine the closeness of the means-to-end fit.[47]

■ We have held that "[w]orkers' compensation benefits are merely an economic interest, and therefore, are entitled only to minimum protection under this court's equal protection analysis."[48] Under this level of protection, the state's ends need only be legitimate and the statute's classification must "bear a fair and substantial relationship to the purposes of the Act."[49]

As we noted above, the act's purpose—to "ensure the quick, efficient, fair and predictable delivery of indemnity and medical benefits to injured workers at a reasonable cost to employers"—is certainly legitimate.[50] Ranney nonetheless argues that the state cannot show that the challenged provision bears a fair and substantial relation to the act's purpose, because ·

> the Act is not intended to do anything except compensate injured workers and their *dependents* for work-related injuries and deaths. The Act is not intended to encourage marriage or to strengthen any traditional concept of marriage or family— its intent under these circumstances is to compensate dependents of a deceased worker.

(Emphasis in original.) Given this purpose, Ranney maintains, the distinction between legally-married spouses and unmarried cohabitants is untenable.

Yet even if one purpose of the act is to compensate *dependents* rather than *families*,[51] Ranney's argument overlooks the fact that the act also serves another, even broader purpose: to provide benefits in a manner that is "quick, efficient, fair, and predictable," at a reasonable cost to the employer.[52] The act's spousal benefit substantially furthers this overarching purpose, even if it might fall short in compensating all potential "dependents."

Because the act's spousal death benefit provision bears a close and substantial relationship to furthering a legitimate state interest, it does not violate Ranney's constitutional right to equal protection. The legislature also had to devise a system that was quick, efficient, and predictable and that could provide benefits without unduly burdening employers. As already noted, the legislature could have taken an ad hoc approach. But it could just as reasonably have concluded that such an approach would be slower, less efficient, and less predictable for beneficiaries and unduly expensive for employers. The legislature's reliance on marriage as the determining factor for spousal death benefits thus bears a fair and substantial relationship to the goal of ensuring the "quick, efficient, fair and predictable" delivery of benefits at a reasonable cost. The act's balance between perfect fairness on the one hand, and cost, efficiency, speed, and predictability on the

---

47. *Malabed v. North Slope Borough*, 70 P.3d 416, 420–21 (Alaska 2003).

48. *Williams v. State, Dep't of Revenue*, 895 P.2d 99, 104 (Alaska 1995).

49. *Id.* (quoting *Gilmore v. Alaska Workers' Comp. Bd.*, 882 P.2d 922, 927 (Alaska 1994)).

50. *Meek*, 914 P.2d at 1281 (citing ch. 79, § 1, SLA 1988).

51. *Compare Taylor v. Southeast-Harrison Western Corp.*, 694 P.2d 1160, 1162 (Alaska 1985) (characterizing the goal of the Act as being "to secure guaranteed and expeditious compensation for injured workers and their *dependents* ....") (emphasis added) *with Wien Air Alaska v. Arant*, 592 P.2d 352, 357 (Alaska 1979) (describing the purpose as "to compensate the victims of work-rated injury for a part of their economic loss, measured by the wage loss to the worker or the surviving *family*") (emphasis added) (*overruled on other grounds by Fairbanks N. Star Borough Sch. Dist. v. Crider*, 736 P.2d 770, 775 (Alaska 1987)).

52. *Meek*, 914 P.2d at 1281.

other, does not violate the equal protection clause.

## IV. CONCLUSION

For the foregoing reasons, we AFFIRM the decision of the board denying death benefits to Ranney.