**NOTICE**

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| ROSEANNE LEYDON, | ) | |
| | ) | Supreme Court No. S-18618 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-20-05299 CI |
| v. | ) | |
| | ) | MEMORANDUM OPINION |
| MUNICIPALITY OF ANCHORAGE, | ) | AND JUDGMENT* |
| | ) | |
| Appellee. | ) | No. 2074 – February 26, 2025 |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Kevin M. Saxby, Judge.

Appearances: Roseanne Leydon, pro se, Anchorage, Appellant. Jason A. Thomas, Assistant Municipal Attorney, and Anne R. Helzer, Municipal Attorney, Anchorage, for Appellee.

Before: Maassen, Chief Justice, and Carney, Borghesan, Henderson, and Pate, Justices.

## I.     INTRODUCTION

An Anchorage property owner leased a dwelling on the property to a family friend in 2018. During that year the Anchorage Police Department (APD) responded to over one hundred calls involving complaints of drug activity, trash dumping, theft, gunshots, and suspicious activity in and around the property.

---

\*     Entered under Alaska Appellate Rule 214.

Eventually the Municipality of Anchorage sought to impose fines for 29 excessive police responses to the dwelling. The property owner appealed the fines to a municipal hearing officer, who allowed fines for only 13 of the responses. The property owner then appealed to superior court, which affirmed the hearing officer's decision.

The property owner appeals. She argues that the municipal ordinance authorizing the fines is unconstitutionally vague and a violation of substantive due process. She also challenges the hearing officer's application of the ordinance to her case. Seeing no reversible error, we affirm the superior court's decision.

## II.   FACTS AND PROCEEDINGS

### A.   Legal Framework

Alaska law allows municipalities to charge the costs of excessive police responses to the owners and tenants of residential property. Under AS 29.35.125(a), a municipality may "impose a fee on the owner of residential property . . . if a member of the municipal police department goes to the property an excessive number of times during a calendar year in response to a call for assistance, a complaint, an emergency, or a potential emergency." The statute requires the municipal ordinance to set out "[t]he number of responses considered to be excessive" and the amount of the fee.[1] "The fee may not exceed the actual cost to the municipality for the excessive responses."[2] The statute also requires municipalities to give the property owner notice of the excessive police responses and an opportunity to cure before a penalty is imposed.[3]

Invoking this authority, the Municipality enacted ordinances providing that "the owner of a property and the tenant of a unit thereon shall jointly pay the Municipality a fee of $500.00 per excessive police response to the dwelling unit."[4] For

---

[1]     AS 29.35.125(a).

[2]     *Id.*

[3]     AS 29.35.125(b).

[4]     Anchorage Municipal Code (AMC) 08.80.020(A).

a residential property, an "excessive police response" is "each police response in excess of eight to a dwelling unit in a calendar year."[5] The ordinance defines what constitutes a police response,[6] defines corrective action,[7] and exempts property owners who take corrective action within 30 days.[8]

The ordinance also contains notice provisions. A property owner is exempt from fees if "[t]he municipality has not provided notice to the person in writing as provided in Section 8.80.030."[9] That section provides that the Municipality "may notify the owner and tenant of a property in writing when the number of police responses in the current calendar year to a single dwelling unit" exceeds eight.[10] The ordinance requires the Municipality to give liable property owners and tenants a chance to cure the circumstances giving rise to the calls before the fee is imposed.[11] It also prevents the Municipality from charging for certain kinds of police activity, like responses to serious bodily injury, domestic violence, sexual assault, or child neglect.[12]

## B. Facts

Roseanne Leydon is the record owner of residential property on Dewberry Street in Anchorage. She is married to Tom Leydon.[13] The Dewberry Street property has two dwellings: Units A and B. In 2018 the Leydons rented Unit B to Ray Harding, Tom's longtime acquaintance. During his time as a tenant, Harding allowed other

---

[5]     AMC 08.80.010.

[6]     *Id.*

[7]     AMC 08.80.040(A).

[8]     AMC 08.80.020(B)(4); AMC 08.80.040(A).

[9]     AMC 08.80.020(B)(3).

[10]     AMC 08.80.030(A); *see* AMC 08.80.010.

[11]     *See* AMC 08.80.020(B)(3); AMC 08.080.030; AMC 08.080.040.

[12]     AMC 08.80.010.

[13]     In this opinion we refer to Roseanne Leydon as "Roseanne," to Tom Leydon as "Tom," and to the couple jointly as "the Leydons."

people to live at the property, and others would break in without his permission. Harding testified that he had been assaulted and robbed "quite a few" times and threatened with a pistol "at least 12 times" during his time in Unit B.

During 2018 APD visited the Dewberry Street property many times in response to calls reporting suspicious activity. The Municipality later alleged that APD had been requested to respond to the property a total of 119 times. Some of these responses pertained to a homicide that occurred in front of the property.[14] But the police responded many other times due to suspected drug sales, trash dumping, reports of gun shots, fights, and reported stolen vehicles. Some of the calls pertained to conduct that the callers perceived as suspicious, but which was not criminal.

After a number of police responses to the property, APD sent Roseanne a notice. The notice explained that Roseanne could be liable for excessive police responses to the Dewberry Street property if she did not take corrective action. It identified the property by its address but did not specify whether the notice pertained to Unit A or B. The notice stated that APD had already made 15 qualifying police responses to the Dewberry Street property. The notice was delivered on August 25.

Tom spoke with an APD officer on September 20 about a corrective action plan. On September 24 Tom served a notice to quit on the occupants of the property, and on September 25 APD received copies of the notice-to-quit paperwork from him. APD accepted this paperwork as suitable corrective action. But even after Harding received the notice to quit, he did not move out. He attempted to find new housing but failed. In the meantime, the police calls and responses continued.

The Municipality eventually sought to impose fines under AMC 08.80.020 for 33 excessive police responses. This included 41 total police responses, the first eight of which were not deemed excessive under the ordinance.

---

[14] APD did not pursue fees for these calls.

## C.    Proceedings

Roseanne, representing herself, appealed the proposed fines to a municipal hearing officer. During these proceedings the Municipality dropped its allegations with respect to four of the calls, leaving 29 excessive responses. Hearings were held over six days between April and December 2019.[15] Tom spoke on behalf of his wife. Tom explained that he had done everything he could to evict Harding. But he maintained that landlord-tenant law and the realities of evicting tenants and sublessees meant that making an arrangement with Harding was the only feasible way to correct the problem. Harding testified that because he and Tom were old friends, Tom cut him a break by not quickly evicting him.

Tom also argued that the Leydons had been prejudiced by APD's delayed notice. He argued that the ordinance requires notice after the eighth qualifying police response. Tom asserted that had he known at the time of the ninth call that he and Roseanne could be held liable for excessive police responses, he would have asked APD to waive the fees.

Tom also asserted that many of the calls were frivolous or insufficiently connected to his property. He asserted that a drug dealer lived across the street from the property. He pointed out that many of the calls and police reports did not specify whether the disturbance was at Unit A or B. He additionally argued that many of his neighbors, and one in particular, made a concerted effort to report even non-suspicious activities to APD. In response the Municipality argued that given APD's experience at the property — apprehending people with outstanding warrants, discovering stolen vehicles, weapons, and drugs, and receiving reports of violence there — APD could reasonably respond to the calls and connect them to Harding's unit.

---

[15]    According to the hearing officer order, the parties entered numerous exhibits into evidence during the proceedings. Many of these exhibits are not in the record on appeal.

The hearing officer issued a decision in January 2020. First, she concluded that all but one of the calls qualified as a police response.[16] Second, the hearing officer concluded that the ordinance allows fines only for excessive police responses that occur after the defendant has received notice. Consequently, the hearing officer held that Roseanne was not liable for police responses that occurred before she received the notice on August 25. Third, the hearing officer concluded that because APD had accepted Tom's notice to quit as suitable corrective action, APD could not impose fees for responses during the 30-day cure period (from August 25 through September 25, 2018). As a result, she ruled that Roseanne was liable for only 13 excessive calls.

Lastly, the hearing officer determined that APD correctly assigned each of these calls to the property. The hearing officer described Tom's arguments regarding the drug house across the street and the ambiguity regarding Units A and B as "strain[ing] logic":

> [T]he record is replete with detailed evidence of dangerous individuals engaging in high-risk activities involving stolen vehicles, weapons, and drugs at the trailer where Mr. Harding resided. This history was well-known to APD and the neighborhood alike and was a significant source of neighborhood concern, with the trailer coming to be known broadly as 'the Dewberry drug house.' Based on the preponderance of the evidence, I find that APD reasonably and correctly assessed each of the calls at issue to the Property.

Consequently, the hearing officer imposed fines with respect to the remaining 13 responses, resulting in a total fine of $6,500.

Roseanne appealed to the superior court. She reiterated many of the arguments from the administrative hearings. She also added a few new arguments. She

---

[16] The excluded call fell within an exception for police responses related to serious bodily injury. *See* AMC 08.80.010.

maintained that the ordinance conflicted with the statute because, among other reasons, the $500-per-call fine in the ordinance did not reflect the "actual cost" of each police response.[17] She argued that the ordinance violated her constitutional rights. She also argued that the Municipality's notice did not satisfy the ordinance because it did not state whether it applied to unit A or B.[18]

The superior court affirmed the hearing officer's order. The court addressed each of Roseanne's arguments on the merits. It held that (1) the hearing officer correctly applied the ordinance; (2) the flat $500-per-call fine is consistent with state law; (3) the ordinance otherwise complies with the state enabling statute; (4) Roseanne failed to cite evidence supporting her allegation that the police failed to identify the dwelling unit; (5) Roseanne failed to provide evidence to support her allegation that APD violated due process; (6) APD's delayed notice complied with the municipal law, the state statute, and due process; and (7) Roseanne failed to show that the ordinance is unconstitutionally vague or otherwise a violation of substantive due process.

Roseanne moved for reconsideration. She reiterated her arguments regarding the late notice, the perceived conflict with state law, and substantive due process. In a summary order the superior court denied reconsideration.

Roseanne appeals.

---

**17** *See* AS 29.35.125(a) (permitting municipality to assess fee that "may not exceed the actual cost to the municipality for the excessive responses").

**18** *See* AMC 08.80.030(C)(1). ("The notice addressed to an owner or tenant shall . . . , if the property has multiple units, identify the dwelling unit or commercial unit . . . .").

## III. STANDARD OF REVIEW

"When a superior court acts as an intermediate court of appeals, we independently review the administrative decision."[19] Several distinct standards apply to review of administrative decisions.

The substantial evidence test applies to questions of fact.[20] Substantial evidence is evidence that "a reasonable mind might accept as adequate to support a conclusion."[21]

The reasonable basis standard applies to questions of law that "implicate[] agency expertise or the determination of fundamental policies within the scope of the agency's statutory functions."[22] When applying the reasonable basis standard, courts give "deference to the agency's interpretation so long as it is reasonable."[23]

The substitution of judgment standard applies to questions of law that do not implicate agency expertise.[24] "Questions of constitutional interpretation are also

---

[19] *Titus v. State, Dep't of Admin., Div. of Motor Vehicles*, 305 P.3d 1271, 1276 (Alaska 2013) (quoting *Alaska Exch. Carriers Ass'n v. Regul. Comm'n of Alaska*, 202 P.3d 458, 460 (Alaska 2009)).

[20] *Griswold v. City of Homer*, 252 P.3d 1020, 1025 (Alaska 2011).

[21] *Luper v. City of Wasilla*, 215 P.3d 342, 345 (Alaska 2009) (quoting *Balough v. Fairbanks N. Star Borough*, 995 P.2d 245, 254 (Alaska 2000)).

[22] *Marathon Oil Co. v. State, Dep't of Nat. Res.*, 254 P.3d 1078, 1082 (Alaska 2011).

[23] *Id.*

[24] *Grimmett v. Univ. of Alaska*, 303 P.3d 482, 487 (Alaska 2013).

reviewed de novo under the substitution of judgment standard."[25]  Under this standard, we apply our own interpretation of the constitutional or statutory provision at issue.[26]

## IV.    DISCUSSION

Roseanne, still self-represented, maintains that she is not liable for any of the 13 police responses deemed excessive by the hearing officer.  She raises several different arguments:   (1) the municipal ordinance is void for vagueness; (2) the ordinance violates substantive due process; and (3) she cannot be fined for the excessive police responses that occurred after the Municipality sent her the notice because the Municipality did not notify her after the first excessive response.  She also alludes to a variety of other arguments, some of which were not preserved below and some of which are waived for inadequate briefing.  None of these arguments warrant reversing the superior court.

### A.    The Ordinance Is Not Unconstitutionally Vague.

Roseanne argues that the ordinance is unconstitutionally vague because it "fails to give adequate notice of what conduct is prohibited."  She takes issue with the ordinance's "indefinite contours" and argues that the timing of the notice required by the code is unclear.

Due process requires statutes to give "fair notice of what is and what is not prohibited."[27]  "A law which 'either forbids or requires the doing of an act in terms

---

[25]    *Studley v. Alaska Pub. Offs. Comm'n*, 389 P.3d 18, 22-23 (Alaska 2017) (quoting *Brandal v. State, Com. Fisheries Entry Comm'n*, 128 P.3d 732, 735 (Alaska 2006)).

[26]    *Marathon Oil Co.*, 254 P.3d at 1082 (quoting *Matanuska-Susitna Borough v. Hammond*, 726 P.2d 166, 175 (Alaska 1986)).

[27]    *VECO Int'l, Inc. v. Alaska Pub. Offs. Comm'n*, 753 P.2d 703, 714 (Alaska 1988); *see Williams Alaska Petroleum, Inc. v. State*, 529 P.3d 1160, 1195 (Alaska 2023).

so vague that [people] of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law.' "[28]

For civil statutes and regulations, unlike criminal laws, "[a]ll that should be required is legislative language which is not so conflicting and confused that it cannot be given meaning in the adjudication process."[29] This standard reflects the United States Supreme Court's "greater tolerance of enactments with civil rather than criminal penalties" because civil penalties are "qualitatively less severe."[30]

Under this more lenient standard, the ordinance was clear enough to provide Roseanne notice. The language in the statute is not so conflicting or confused that it cannot be given meaning in the adjudicative process.

First, the language in the notice provision can be given meaning. Indeed, the hearing officer's interpretation gave it meaning in this case. The hearing officer concluded that the Municipality was not *required* to give notice upon the eighth qualifying police response, but that no fee could be imposed for police responses that occurred before the Municipality gave notice. According to this interpretation, if the Municipality did not notify the property owner until after the twelfth police response, no fine could be levied for the first twelve responses — even though the ordinance defines an "excessive police response" as each response "in excess of eight."

---

**28**     *Fantasies on 5th Ave., LLC v. Alcoholic Beverage Control Bd.*, 446 P.3d 360, 372 (Alaska 2019) (alteration in original) (quoting *Halliburton Energy Servs. v. State, Dep't of Lab.*, 2 P.3d 41, 51 (Alaska 2000)).

**29**     *Williams v. State, Dep't of Revenue*, 895 P.2d 99, 105 (Alaska 1995); *see also Lazy Mountain Land Club v. Matanuska-Susitna Borough Bd. of Adjustment & Appeals*, 904 P.2d 373, 383-84 (Alaska 1995) (The degree of vagueness that the Constitution tolerates . . . depend[s] in part on the nature of the enactment." (quoting *Vill. of Hoffman Ests. v. Flipside, Hoffman Est., Inc.*, 455 U.S. 489, 498-99 (1982))).

**30**     *Lazy Mountain Land Club*, 904 P.2d at 383 (quoting *Vill. of Hoffman Ests., Inc.*, 455 U.S. at 489-99).

The hearing officer reached this interpretation based on the text and legislative history of the ordinance. Under AMC 08.80.020 a person is exempt from fees if "[t]he municipality has not provided notice to the person in writing as provided in Section 8.80.030."[31] Section 08.80.030 provides: "The municipality may notify the owner and tenant of a property in writing when the number of police responses in the current calendar year to a single dwelling unit . . . in a property equals [nine or more]."[32] An assembly memorandum attached to an earlier version of the ordinance explains that the discretionary language for the notice ("the municipality *may*") was requested by APD.[33] An initial draft of the provision used the word "shall." As a result the amended ordinance substituted the word "may" so that APD could "concentrate [its] limited resources on the . . . properties that it considers to be the highest priorities for enforcement."[34] The Assembly Memorandum clarifies that "[d]espite this change" the provision "still makes notification a prerequisite to the imposition of a fee under the ordinance."[35] In light of this legislative history and the ordinance's text, the hearing officer concluded that the ordinance did not allow APD to impose fees for police responses that occurred before the date of notice.[36]

We therefore reject Roseanne's argument that the notice requirement is unconstitutionally vague. Property owners do not lack fair warning about whether or

---

[31]     AMC 08.80.020(B)(3).

[32]     AMC 08.80.030(A); AMC 08.80.010.

[33]     Memorandum from Allan Tesche, Assembly Member, Anchorage Assembly, to Mun. of Anchorage Assembly 2 (Nov. 26, 2002), https://www.muni.org/departments/assembly/legislation/2002%20ordinances /ao2002-144_(s).pdf.

[34]     *Id.*

[35]     *Id.*

[36]     The Municipality did not cross-appeal this ruling and does not challenge the hearing officer's interpretation.

not the Municipality must notify property owners about the possible fees, even if the Municipality has discretion on when to provide the notice.

Second, to the extent Roseanne argues that the ordinance's definition of "police response"[37] lacks meaning, we disagree. AMC 08.80.020(A) provides that the "owner of a property" is liable to the Municipality for "a fee of $500.00 per excessive police response to the dwelling unit . . . during a calendar year." AMC 08.80.010 defines "police response" as when

> one or more police officers go[] to a property in response to a call for assistance, a complaint, an emergency, a potential emergency, or a reasonable suspicion of unlawful activity witnessed by a police officer, and any response determined by a sergeant or higher ranking police officer to be related to activities on the property premises and reasonably preventable.

An "excessive" response means, "[f]or a residential property, each police response in excess of eight to a dwelling unit in a calendar year."[38]

Under these provisions, a response occurs when an officer "goes to the property" for certain listed reasons. The definition therefore presumes some connection between the response and the property. The Assembly Memorandum explains that the term "police response" was intended to "include all instances in which a police incident or case number is linked to an occurrence at a specific residential property" and "need not be limited to visits in response to radio dispatches."[39] The memorandum also explains that one of the purposes of the legislation was to "provide an incentive to the owner to correct the cause of the excessive responses."[40]

---

[37]  AMC 08.80.010.

[38]  *Id.*

[39]  Tesche Memo, *supra* note 33, at 2.

[40]  *Id.* at 1.

This legislative history supports a narrower interpretation of "goes to a property" than that language might at first glance suggest. A "police response" must be linked to an "occurrence at a specific residential property."[41] And given the legislative purpose of creating an incentive "to correct the cause of the excessive responses," "police responses" may also be linked to conditions that a property owner can reasonably fix. We do not agree with Roseanne that the term "police response" cannot be given meaning.

The qualifying prompts for a police response also are defined in reasonably clear terms: "a call for assistance, a complaint, an emergency, a potential emergency, or a reasonable suspicion of unlawful activity witnessed by a police officer."[42] This part of the definition "is not so conflicting and confused that it cannot be given meaning in the adjudication process."[43]

Although we are concerned by the part of the definition giving a "sergeant or higher ranking police officer"[44] discretion to count other responses beyond those described in the first portion of the ordinance, nothing in the record suggests that the Municipality used this portion of the ordinance to charge Roseanne for excessive police responses. The charged responses all fall squarely within the first half of the definition — police officers went to the property in response to "a call for assistance, a complaint, an emergency, a potential emergency, or a reasonable suspicion of unlawful activity witnessed by a police officer."[45] Therefore we need not decide whether the second portion of the ordinance is unconstitutionally vague.

---

[41] *Id.* at 2.

[42] AMC 08.80.010.

[43] *Lazy Mountain Land Club v. Matanuska-Susitna Borough Bd. of Adjustment & Appeals*, 904 P.2d 373, 383 (Alaska 1995) (quoting *Williams v. State, Dep't of Revenue*, 895 P.2d 99, 105 (Alaska 1995)).

[44] AMC 08.80.010.

[45] *Id.*

In sum, we reject Roseanne's argument that the ordinance "fails to give adequate notice of what conduct is prohibited."

**B.      The Ordinance Does Not Violate Substantive Due Process.**

Roseanne's brief also invokes substantive due process. We conclude that the ordinance satisfies due process because it is reasonably related to the legitimate purpose of giving property owners an incentive to minimize disturbances on their property.

The Alaska Constitution provides that "[n]o person shall be deprived of life, liberty, or property, without due process of law."[46] This includes the protection of "substantive due process." "Substantive due process is a doctrine that is meant to guard against unfair, irrational, or arbitrary state conduct that 'shock[s] the universal sense of justice.' "[47]

When reviewing an alleged violation of substantive due process, we apply different levels of scrutiny depending on the burdened right.[48] For example, "when a law substantially burdens a fundamental right, the State must articulate a *compelling* state interest that justifies infringing the right and must demonstrate that no less restrictive means of advancing the state interest exists."[49] This is called "strict scrutiny."[50] But when "state action interferes with an individual's liberty interest that is not characterized as fundamental, the State must show a legitimate state interest and a 'close and substantial relationship' between that interest and the chosen means of

---

[46]      Alaska Const. art. I, § 7.

[47]      *Doe v. State, Dep't of Pub. Safety*, 444 P.3d 116, 125 (Alaska 2019) (alteration in original) (quoting *Church v. State, Dep't of Revenue*, 973 P.2d 1125, 1130 (Alaska 1999)).

[48]      *See Ass'n of Vill. Council Presidents Reg'l Hous. Auth. v. Mael*, 507 P.3d 963, 981 (Alaska 2022).

[49]      *Doe*, 444 P.3d at 125 (emphasis in original).

[50]      *Id.*

achieving it."[51]   This is called "intermediate scrutiny."[52]   "The most lenient level of scrutiny is rational basis review, under which 'the party claiming a substantive due process violation has the burden of showing that there is no rational basis for the challenged legislation.' "[53]   "This burden is a heavy one, for if any conceivable legitimate public policy for the enactment is apparent on its face or is offered by those defending the enactment, the opponents of the measure must disprove the factual basis for such a justification."[54]   When the state action threatens "economic interests only," we apply rational basis review.[55]

The interests at stake here are economic, so rational basis review applies. According to the Assembly Memorandum, the purpose of AS 29.35.125 is to "make the owner of residential property bear the cost of excessive police responses to the property, and to provide an incentive to the owner to correct the cause of the excessive responses."[56]   The ordinance does so by allowing the Municipality to fine property owners and tenants if police go to the property for qualifying reasons an excessive number of times.[57]   It is rational to believe that fining property owners for police responses will incentivize them to correct the circumstances on their property leading

---

[51]    *Id.* at 125-26 (quoting *Sampson v. State*, 31 P.3d 88, 91 (Alaska 2001)).

[52]    *Id.* at 125.

[53]    *Ass'n of Vill. Council Presidents Reg'l Hous. Auth.*, 507 P.3d at 981 (quoting *Doe*, 444 P.3d at 126).

[54]    *Doe*, 444 P.3d at 126 (quoting *Concerned Citizens of S. Kenai Peninsula v. Kenai Peninsula Borough*, 527 P.2d 447, 452 (Alaska 1974)).

[55]    *Ass'n of Vill. Council Presidents Reg'l Hous. Auth.*, 507 P.3d at 981 (quoting *L.D.G., Inc. v. Brown*, 211 P.3d 1110, 1132 (Alaska 2009)).

[56]    Tesche Memo, *supra* note 33, at 2.

[57]    AMC 08.80.010-.020(A).

to continued police calls. Therefore the ordinance survives rational basis review, and Roseanne's substantive due process challenge does not succeed.[58]

> ### C. The Hearing Officer Did Not Err In Ruling That Roseanne Is Liable For Excessive Police Responses That Occurred After The Municipality Sent Notice.

Roseanne also argues that the timing of the notice made all of the charges invalid. She asserts that the ordinance required APD to give notice of her potential liability after the eighth police response. She suggests that because APD did not give her notice until after the 19th response, it could not impose fees for *any* police responses, even those occurring after it eventually gave her notice. The hearing officer disagreed. The hearing officer relied on the plain meaning of the word "may" and the legislative history described in the Assembly Memorandum.

As we explained earlier, the language of the ordinance and the legislative history support the hearing officer's interpretation. The ordinance states that the Municipality "may notify" the owner when the number of police responses become excessive.[59] As originally proposed this ordinance said that APD "shall" provide notice, but the Anchorage Assembly decided to substitute discretionary language so that APD was not required to pursue fines against a property owner and could instead decide how to allocate its resources.[60] The Assembly made the amendment so that APD has discretion to decide whether to seek fines from a property owner after the eighth

---

[58]     To the extent that Roseanne challenges the rationality of the ordinance as applied to specific instances, her argument is waived because she has not developed it. *See Wright v. Anding*, 390 P.3d 1162, 1175 (Alaska 2017) (A pro se litigant's "[f]ailure to develop an argument constitutes a waiver of that argument, and the argument will be considered abandoned.").

[59]     AMC 08.80.030(A); *see* AMC 08.80.010.

[60]     Municipality of Anchorage, Ordinance No. 2002-144(S), at 6 (Nov. 26, 2002), https://www.muni.org/departments/assembly/legislation/2002%20ordinances/ao2002-144_(s).pdf.

qualifying call.  And APD *must* give notice *before* it may impose fees on a property owner.[61]  But the ordinance does allow fines for excessive police responses *after* APD eventually does give notice.  Therefore the hearing officer did not err by imposing fees for the calls that occurred after Roseanne received the mailed notice.

**D.    Roseanne's Other Arguments Are Either Inadequately Briefed Or Were Not Preserved For Appeal.**

Roseanne's brief alludes to several other theories.  These other arguments were either not preserved for appeal or were inadequately briefed.

**1.    Because Roseanne failed to raise the improper notice argument to the hearing officer, we do not consider it on appeal.**

Roseanne argues that the Municipality's notice violated the ordinance.  She cites to AMC 08.80.030(C)(1), which provides that the "notice addressed to an owner shall . . . , if the property has multiple units, identify the dwelling unit or commercial unit."  Testimony before the hearing officer indicated there were two units on Roseanne's property — A and B.  But the notice that Roseanne received from the Municipality did not identify which unit had accumulated the excessive police responses.  Roseanne therefore argues that the notice was deficient.  But because she did not make this argument to the hearing officer, she did not preserve the argument for appeal.

The rule of issue exhaustion means that a litigant must raise a particular issue in the administrative hearing in order to raise the issue on appeal to a reviewing court.[62]  When a statute or ordinance does not expressly require issue exhaustion, we must "determine whether a judicially created issue exhaustion requirement is

---

[61]    *See* AMC 08.80.020(B)(3).

[62]    *Walker v. State, Dep't of Corr.*, 421 P.3d 74, 79 n. 17 (Alaska 2018) (citing 4 KENNETH CULP DAVIS, ADMINISTRATIVE LAW TREATISE § 26:7 (2d ed. 1983)); *see Sims v. Apfel*, 530 U.S. 103, 109 (2000) (noting that issue exhaustion is "essential in order that litigants may not be surprised on appeal by final decision . . . of issues upon which they have had no opportunity to introduce evidence").

appropriate."[63]  "[T]he rationale for requiring issue exhaustion is at its greatest" where "the parties are expected to develop the issues in an adversarial administrative proceeding" before a forum "vested with authority to determine questions of fact."[64]

We conclude that exhaustion was required here.  Determining the precise facts was important context for Roseanne's notice argument.  For example, at one point in the hearing, testimony raised questions whether the two dwellings were reflected in municipal property records.  It is possible that precisely what counts as a dwelling unit may be relevant to the Municipality's legal obligation to provide notice.  It is not apparent from the ordinance itself whether the Municipality would be required to specify the "dwelling unit" inhabited by a tenant living in an unofficially subdivided property.[65]  Therefore Roseanne was required to exhaust this issue by raising this argument before the hearing officer, whose role was to decide questions of fact.

Roseanne did not do so.  Tom (speaking on behalf of Roseanne) seemed to raise two different arguments before the hearing officer.  First, he suggested that because there were two dwellings on the property, Roseanne was entitled to 16 police responses rather than eight before a fine could be assessed.  Second, he suggested that many of the calls could not be properly attributed to Unit B, where Harding lived.  These issues are different than the notice requirement in AMC 08.80.030(C) that Roseanne argues on appeal to our court.  Roseanne did not give the Municipality fair notice that it would need to develop a factual record or argument with respect to the content of the

---

[63]     *Walker*, 421 P.3d at 79 (citing *Sims*, 530 U.S. at 107-08).

[64]     *Sims*, 530 U.S. at 109-10 (quoting *Hormel v. Helvering*, 312 U.S. 552, 556 (1941)).

[65]     *Cf. Doubleday v. State, Com. Fisheries Entry Comm'n*, 230 P.3d 100, 107-08 (Alaska 2010) (holding administrative exhaustion of administrative remedies required for challenge to Commercial Fisheries Entry Commission's determination that number of vessels equals number of gear units when calculating number of permits based on number of gear units).

mailed notice, nor did she give the hearing officer notice that this was an issue that had to be decided. Therefore, the issue is waived, and we do not address it.

### 2. Roseanne's other theories are inadequately briefed.

Roseanne alludes in her brief to a handful of other theories for why the Municipality cannot collect the fees. But these arguments are waived for inadequate briefing. Although she describes legal principles, she does not explain how they apply in this case.

"[A]s a general matter, issues not briefed or only cursorily briefed are considered waived."[66] "Failure to develop an argument constitutes a waiver of that argument, and the argument will be considered abandoned."[67] "We apply a more lenient standard" to self-represented litigants.[68] But even self-represented litigants "must cite authority and provide a legal theory."[69]

Roseanne claims that the ordinance conflicts with statute. She quotes from authorities explaining that a later-passed enactment may impliedly overrule existing law. She discusses how to evaluate statutory provisions for the presence or absence of conflict. Later she explains that state statutes supersede conflicting municipal ordinances. She writes that the conflict "arose in the application, enforcement, and . . . the subjective interpretation of AMC 8.80.020." But nowhere in this discussion does Roseanne point to any particular phrase or provision of the ordinance that conflicts with the state enabling statute. Nor does she explain how an

---

[66] *Wright v. Anding*, 390 P.3d 1162, 1176 (Alaska 2017).

[67] *Id.*

[68] *Casciola v. F.S. Air Serv., Inc.*, 120 P.3d 1059, 1062-63 (Alaska 2005).

[69] *Hooks v. Alaska USA Fed. Credit Union*, 413 P.3d 1192, 1197 (Alaska 2018) (quoting *Wright*, 390 P.3d at 1169).

ordinance could be preemptively repealed by an earlier-enacted statute.[70]  Without a theory for how the legal principles she cites apply in this case, her argument is waived for inadequate briefing.

Roseanne also makes an argument about the burden of proof.  She asserts that "[a]s far as the superior court was concerned, everything came back to [Roseanne] and nothing else mattered."  She characterized this as an "excessive" burden of proof and claimed that applying this excessive burden was "an abuse of discretion."  But Roseanne does not explain to which arguments the court applied this higher standard or how it harmed her.  And we see no indication that the hearing officer applied an improper burden of proof or that the superior court applied incorrect standards of review.  Without more explanation of this asserted error, we cannot evaluate this argument on appeal.

Finally, Roseanne characterizes some of the calls resulting in police responses as "ridiculous."  This seems like a statutory interpretation argument alleging that these calls should not count as "[p]olice response[s]" for purposes of the ordinance.[71]  She also maintains that neither the superior court nor the hearing officer interpreted the ordinance.

To the contrary, the hearing officer did interpret the ordinance.  The hearing officer concluded that the ordinance's definition of a police response included instances when officers responded based on information provided by other officers.  The hearing officer designated the remaining calls as responses to complaints, calls for assistance, or potential emergencies.[72]  And the hearing officer excluded one response

---

[70]  The effective date of AS 29.35.125 preceded the ordinance enacting AMC 08.80.  *See* Ch. 111, § 2, SLA 2002; Municipality of Anchorage, Ordinance No. 2002-144(S), at 1 (Nov. 17, 2009).

[71]  *See* AMC 08.80.010 (defining "Police response").

[72]  *See id.*

based on an exception for medical emergencies. The superior court reviewed the hearing officer's conclusions and affirmed them. Roseanne's assertion that the hearing officer and superior court never interpreted the ordinance is incorrect.

Moreover, Roseanne does not explain what the correct interpretation of the ordinance should be. Nor does she explain why the hearing officer's approach to the ordinance is contrary to text, legislative history, or purpose.[73] Without some further explanation for how the hearing officer erred, we cannot discern Roseanne's argument.[74] Consequently, Roseanne's statutory construction argument is waived.

## V.    CONCLUSION

We AFFIRM the superior court's decision.

---

[73]    *State v. Planned Parenthood of the Great Nw.*, 436 P.3d 984, 992 (Alaska 2019) ("When 'interpreting a statute, we consider its language, its purpose, and its legislative history, in an attempt to "give effect to the legislature's intent, with due regard for the meaning the statutory language conveys to others." ' " (quoting *Alyeska Pipeline Serv. Co. v. DeShong*, 77 P.3d 1227, 1234 (Alaska 2003))).

[74]    *Wright*, 390 P.3d at 1175 ("[T]o avoid waiver, a pro se litigant's briefing must allow his or her opponent and this court to discern the pro se's legal argument. Even a pro se litigant . . . must cite authority and provide a legal theory." (first alteration added) (quoting *Casciola v. F.S. Air Serv., Inc.*, 120 P.3d 1059, 1063 (Alaska 2005))).